# Illinois Official Reports

## Appellate Court

***People v. Viramontes*, 2014 IL App (1st) 130075**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS VIRAMONTES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-0075 |
| Filed | September 24, 2014 |
| Rehearing denied | October 21, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder in the fatal beating of his wife following the discovery of her infidelity was upheld over his contentions that an instruction should have been given on second degree murder because his discovery of suggestive text messages and photographs equated to the personal discovery of adultery, and that he and his wife engaged in mutual combat, that instructions on involuntary manslaughter, aggravated battery and domestic battery were improperly rejected, that allowing the jury to see autopsy photographs of the victim's head injuries was prejudicial and that his cross-examination of a witness who testified about a prior incident in which he slapped the victim was improperly admitted, since an instruction on provocation in such circumstances is limited to cases where the parties are in the act of adultery or immediately before or after the act and the killing follows immediately, the circumstances in defendant's case were not legally adequate provocation, with respect to the claim of mutual combat, the victim was under the influence of cocaine, defendant initiated the fight, and he responded disproportionately, the request for the lesser included instructions was properly denied, the autopsy photographs were relevant to the extent and nature of the victim's injuries and any error in the limitation of defendant's cross-examination of the witness who testified about the incident in which defendant slapped the victim was harmless. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-5564; the Hon. Joseph G. Kazmierski, Jr., Judge, presiding. |
| --- | --- |
| Judgment | Affirmed. |
| Counsel on Appeal | Samuel Adam and Lauren Kaeseberg, both of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Lisanne Pugliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Lavin and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1    A newlywed, defendant Luis Viramontes, discovered his wife's infidelity by reading text messages and seeing naked pictures she exchanged with her lover. Married for only a few months after a 16-year relationship and two children, Luis confronted her and she admitted to the liaisons. He then brutally beat her as she struggled to defend herself. She later died from her injuries. At trial, Luis admitted he caused the injuries that led to the death, but claimed he was seriously provoked by her infidelity and that she willingly engaged in aggression against him. A jury convicted Luis of first degree murder.

¶ 2    Luis contends the trial court should have given a second degree murder instruction because the suggestive text messages and photographs equate to personal discovery of the adulterous act itself and warrant a provocation instruction. But, Luis learned of his wife's infidelity from her cell phone and through her admission, neither of which amounts to a legally adequate provocation, and, therefore, the trial court properly refused the second degree murder instruction.

¶ 3    As to provocation based on both parties willingly entering a fight on equal terms (mutual combat), the extent and severity of his wife's physical injuries show that she and Luis were not on equal terms. The trial court properly held Luis was the aggressor and, therefore, provocation by mutual combat was not established.

¶ 4    Luis also contends the trial court erred in denying his request for instructions on involuntary manslaughter, aggravated battery, and domestic battery. Again, the trial court

properly refused to give the instructions, holding the facts and circumstances did not warrant giving instructions on these lesser-included offenses.

¶ 5    In addition, Luis objects to the trial court allowing the jury to view two autopsy photographs of his wife's head injuries, which he claims were unduly prejudicial and inflammatory. We find the trial court properly exercised its discretion by admitting the photographs to assist the jury in understanding the medical examiner's testimony about the nature of the injuries and the basis for her opinion that homicide was the cause of death.

¶ 6    Lastly, Luis argues the trial court improperly limited his cross-examination of State witness Liliana Almazan, which might have revealed bias or motive to lie. We find the trial court did not abuse its discretion in limiting the defense's cross-examination.

¶ 7                               BACKGROUND

¶ 8    On January 9, 2010, Luis and his wife Sandra were still newlyweds, having married a few months earlier. Their relationship as a couple, though, went back 16 years, and for the last 8 years, they had lived together and had two young children. The couple went out for dinner and drinks with family and friends to celebrate Luis's birthday. Sandra's mother watched their children overnight. The party ended around 11 p.m. Luis testified that on the drive home, he noticed Sandra received a text message, which he thought was strange. Sandra fell asleep in the car, so when they arrived home, Luis carried her inside and put her to bed. When he returned to the car for their belongings, he checked Sandra's phone and saw a sexually explicit text message exchange between Sandra and "Denise."

¶ 9    Luis testified that, concealed to him at the time, Sandra was having an extramarital affair with Andres (Andy) Ochoa, a former coworker. Sandra and Andy met in 2004 and their relationship became sexual in 2007. Sandra saved Andy's phone number in her cell phone as "Denise." On January 9, Sandra and Andy exchanged 18 text messages. Their conversation mentioned meeting up and a request from Andy for suggestive photographs. In reply, Sandra sent four or five naked pictures of herself.

¶ 10   Luis testified that when he saw the messages and photographs, he "felt like [his] whole life was turned upside down." He tried calling Denise's number to discover who Sandra had been texting, but no one answered. Luis testified that when he saw the text from Denise stating "you're making me hard," he knew it was from a man and that Sandra was having an affair.

¶ 11   Luis testified he then went into the house to confront Sandra about the affair. He found her in the bathroom snorting cocaine and they argued about the drugs.

¶ 12   Their argument continued into the living room, where Luis confronted Sandra about the text messages and naked photographs. Sandra asked for her phone back. Luis tried again to call Denise's number. Sandra told Luis that "Denise" was really Andy and that she had been intimate with him and they were in love.

¶ 13   Luis testified he was "angry" and "devastated." He hit Sandra in the face with an open hand. Sandra ran into the bedroom and locked the door. Luis continued to yell at Sandra, calling her vulgar names and reading the text messages aloud. Luis then spray painted the living room and hallway walls and their wedding pictures with explicit words related to the affair. He sat at the kitchen table, put his head down and cried.

¶ 14   Sandra came out of the bedroom and when she saw the spray-painted walls, ran toward Luis screaming and swinging at him. She began to hit him in the chest, so he grabbed Sandra's

shoulders, "threw her against the door, and then tossed her over the table." Luis told Sandra he was leaving her. She got up and ran at him again. Luis grabbed her by the shoulders and threw her against the refrigerator and then onto the kitchen floor, telling her "Get off me. Leave me. I'm leaving you. I'm not going to be with you no more." He then walked toward the back door.

¶ 15 Sandra got up from the floor, threw her wedding rings at Luis and said she did not want to be married. Luis testified Sandra then told him that when he had driven her to a doctor's appointment for a cancer scare, she had misled him and was really having an abortion. Sandra told him, "I don't want to have no more kids with you, that's why I killed your baby. I had an abortion and killed your baby." Luis testified that after Sandra told him about the abortion, he "felt like [he] was part of what she had did." He testified he "lost it" and "couldn't control [himself] after that." Luis grabbed Sandra and threw her into the refrigerator, causing her to hit her head hard. He then threw her onto the floor, where she hit her head again. On the floor in the fetal position, Sandra tried to cover herself as Luis hit her in the face with his hands four or five times.

¶ 16 Luis testified that although he hit and threw Sandra, he was not trying to kill her. He said he was close to potential weapons, including knives, but did not use any because, as he put it, "I wasn't trying to kill her." Luis went outside to calm down, and texted "Denise," who did not respond. Around 2:30 a.m., he called his brother, Fernando, and asked him to come over.

¶ 17 When he went back inside the home, Sandra was in bed. He went over to her and asked if she was alright. She responded, "Babe, I'm sorry," to which he replied he was sorry too. Luis testified Sandra told him to lay next to her and he did. He claimed she hugged him and told him she loved him. Luis testified he tried to comfort her and then she went to sleep.

¶ 18 Fernando Viramontes testified he had been at the birthday party with the couple earlier that night. At dinner, people were drinking alcohol, including Luis and Sandra. When everyone left the restaurant, Fernando offered to drive Luis and Sandra home because they had been drinking, but Luis declined.

¶ 19 Fernando testified Luis called him around 2 o'clock the next morning and told him he had argued with Sandra and she was not breathing correctly. Luis asked Fernando to come over. When Fernando asked if it could wait until the morning, Luis said he needed someone to talk to. Fernando arrived at the couple's home shortly after 3 a.m. He noticed the walls had been spray painted. He looked in the bedroom and saw Sandra. He testified she did not look hurt, and he thought she was sleeping off her intoxication. He did not notice her breathing unusually and did not believe she needed medical attention. When he asked Luis what happened, Luis seemed confused and repeated the same phrase over and over, "I trusted her, I trusted her." Luis told Fernando he had hit Sandra with his hands.

¶ 20 Fernando testified he suggested Luis lay down with Sandra and comfort her. Fernando slept in a separate bedroom. Luis woke Fernando around 8:30 a.m. and told him that Sandra was breathing differently. Fernando ran to the bedroom. Sandra's breathing was heavy; she mumbled and moaned. He noticed redness on her face, shoulders, and chest. And, he saw blood on the mirror and bed sheet. Fernando again asked Luis what happened. Luis told him to call an ambulance, which Fernando did. According to Fernando, Luis was "very nervous, shocked, [and] confused" and in a state he had never seen his brother. Luis left the house at his instruction, but called "countless times" throughout the day to check on Sandra. Luis contacted a defense attorney and met with him that day.

- 4 -

¶ 21    Fernando was impeached with his grand jury testimony. Before the grand jury, Fernando testified that when he first arrived at the house, he saw bruises on Sandra's face, arms, legs, and feet. He also noticed she was breathing heavily and moaning. In addition, he testified that Luis told him he hit Sandra with his fists, hands, and feet, and that they should let Sandra rest. At that time, Fernando said Luis wanted to lay by Sandra and comfort her.

¶ 22    Sandra's mother testified that just before 9 a.m., she received a call from Luis. Luis told her, "I'm sorry I beat up Sandra." Sandra's mother went to the house. When she arrived, she noticed spray paint on the walls. In the bedroom, she found Sandra lying in bed with Fernando in the room staring at her. She said Sandra was "all beat up" and "cold, hard and clammy" to the touch. Sandra's breathing was shallow. She rubbed Sandra's face and asked her to open her eyes, but she did not. She testified she told Fernando to call 911.

¶ 23    Police officer Vida Sheehan arrived around 9 a.m. Sandra was in bed, breathing shallowly. Her eyes were open, but "lifeless" and she appeared "severely beaten" with bruising. Sheehan called for an ambulance, which arrived quickly and transported Sandra to Christ Hospital.

¶ 24    In the emergency room, Sandra was unable to communicate. Photographs were taken of her injuries and extensive bruising. She had no fractures or injuries to her internal organs, other than her brain. Toxicology reports were positive for cocaine. Sandra was put on life support.

¶ 25    With his attorney, Luis turned himself in to the police on January 13, 2010. An evidence technician testified he observed Luis that day and his injuries consisted solely of a scratch to his right forearm and an abrasion on his left elbow.

¶ 26    Sandra remained in a coma until her family had her ventilator removed when they were informed she would not recover. Sandra died on January 31, 2010.

¶ 27    The hospital trauma and surgical critical care attending physician when Sandra was admitted, Dr. David McElmeel, testified as an expert. On January 10, 2010, Dr. McElmeel observed multiple bruises on Sandra's body, decreased consciousness, and severe edema or swelling of the brain. He found bilateral subdural hematomas (an accumulation of blood on the brain's surface) from blunt head trauma and bruising around her forehead, eyes and nose, arms, shoulders, chest area, hands, and hip. Lacerations covered the bridge of the nose, forehead, and right ankle. Dr. McElmeel explained Sandra suffered significant trauma and that severe force had to be applied to cause her injuries. Regarding the toxicology screen testing positive for cocaine, McElmeel testified cocaine did not contribute to or cause Sandra's death.

¶ 28    Dr. Michael Humilier performed Sandra's autopsy. He testified that Sandra was 30 years old and weighed 91 pounds (the parties stipulated she weighed 104 pounds when she entered the hospital). Dr. Humilier noted 27 external evidences of injury and extensive bruising covering almost every body surface. He found a subdural hemorrhage, a collection of blood under the skull between the layers of tissue that surround the brain, and cerebral edema, swelling of the brain.

¶ 29    Detailed photographs of Sandra's injuries taken at the hospital and during the autopsy were entered into evidence over defense counsel's objections. During Dr. Humilier's testimony, the State had him leave the witness stand and detail injuries in two photographs of Sandra's brain (People's Exhibits 29 and 30). The defense objected strenuously. Exhibit 29 shows the under-surface of the portion of Sandra's skull that was removed during the autopsy which indicated blood broke down and was absorbed by her body after injury. Exhibit 30 depicts the surface of Sandra's brain swelling beyond the size of her skull. Dr. Humilier testified that the

force had to be significant to inflict such devastating injuries, something appreciably more severe than banging her head against the wall. In Humilier's opinion, the cause of death was bronchopneumonia due to blunt force trauma from assault. He ruled the death a homicide. He also testified a drug overdose did not contribute to or cause Sandra's death.

¶ 30 The State called Liliana Almazan whose child Sandra's brother fathered. Almazan testified she had known Sandra for 11 years and considered her as a "sister." A year before Luis and Sandra married, Almazan attended a party at their home and saw Luis hit Sandra. Before Almazan testified, the defense sought to introduce photographs during cross-examination that showed injuries Luis's niece, Crystal Viramontes, sustained during a physical fight with Almazan in June 2010. The court prohibited the defense from cross-examining on this issue and did not allow the photographs into evidence.

¶ 31 During cross-examination, Almazan stated Sandra's brother, her child's father, was in court watching her testify. She also admitted to not telling the police she witnessed Luis hit Sandra until May 2011 and to some discrepancies in her story.

¶ 32 The defense presented Miriam Viramontes, Luis's cousin, and Cynthia Pena, a family friend of Luis's, to contradict Almazan's claim that Luis hit Sandra. Both witnesses also testified Luis and Sandra appeared happy at the party.

¶ 33 At the jury instruction conference, the defense tendered 18 jury instructions, including a lesser-included instruction for second degree murder based on provocation. The defense argued sufficient evidence existed for provocation based on adultery and mutual combat. The State responded that the case did not fit into any of the four categories meriting a second degree instruction. The court agreed. The defense also sought instructions on involuntary manslaughter, domestic battery and aggravated battery. The court denied these as well.

¶ 34 The jury found Luis guilty of first degree murder. The trial court sentenced Luis to 25 years in prison. The posttrial motion for a new trial was denied.

¶ 35                                               ANALYSIS
¶ 36                                          Jury Instructions
¶ 37 Jury instructions guide the jury toward a proper verdict by defining the law that the jury must follow in coming to its decision. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). As a reviewing court, we determine whether the instructions fully and fairly set out the law applicable to the theories of the State and the defense. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Whether to give a certain jury instruction falls within the sound discretion of the trial court, and we will reverse its judgment only on an abuse of discretion. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). The question of the sufficiency of evidence in the record to support a jury instruction, however, is a legal question reviewed *de novo*. *People v. Washington*, 2012 IL 110283, ¶ 19.

¶ 38                              Second Degree Murder Instruction
¶ 39 First degree murder may be reduced to second degree murder when, at the time of the killing, the defendant "is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed." 720 ILCS 5/9-2(a)(1) (West 2010). Serious provocation is "conduct sufficient to excite an intense passion in a

reasonable person." 720 ILCS 5/9-2(b) (West 2010). Illinois courts recognize four categories of serious provocation: (1) substantial physical injury or assault; (2) mutual quarrel or combat; (3) illegal arrest; and (4) adultery with the offender's spouse. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). A defendant is entitled to a second degree jury instruction when there is some evidence, even if the evidence is "slight," to support a claim of serious provocation. *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 49 (citing *People v. Davis*, 213 Ill. 2d 459, 478 (2004)). The trier of fact determines the sufficiency of the provocation to cause intense passion. *People v. McCarthy*, 181 Ill. App. 3d 208, 211 (1989) (citing *People v. Yates*, 65 Ill. App. 3d 60 (1978)).

¶ 40    Luis claims a second degree murder instruction because, if believed by the jury, the evidence demonstrated that when Luis beat Sandra, he acted under a sudden and intense passion stemming from serious provocation. Luis contends the manner of his discovery is akin to being present during an adulterous act, and warrants a second degree murder instruction. Because he admitted he caused Sandra's injuries, he argues that the only disputed issue was the intent behind his actions. Thus, without a second degree murder instruction, Luis maintains, the jury was unable to reconcile the facts with the law it was provided. We disagree.

¶ 41    Luis's discovery of Sandra's infidelity through sexual text messages and exchanged naked photographs does not, as a matter of law, constitute adultery under the specified bases for provocation in *People v. Chevalier*, 131 Ill. 2d 66 (1989), and its progeny. In each of the consolidated cases in *Chevalier*, the defendant shot and killed his wife and was convicted of murder. *Chevalier*, 131 Ill. 2d at 69. In each case, the defendant suspected his wife of infidelity. *Id*. at 70. And, just before the killing, the defendant and his wife argued, during which she admitted having an affair and either disparaged her spouse's sexual abilities or flaunted that she had slept with her lover in the marital bed. *Id*. The victims were shot during the arguments. *Id*. The common issue in both appeals was whether, as a matter of law, the provocation of the victim sufficed to reduce the killing from murder to voluntary manslaughter. *Id*. at 69. In both cases, the appellate court reversed the convictions and remanded for new trials. *Id*. at 70. Our supreme court reversed and reinstated both defendants' convictions, holding that the provocation claimed was legally insufficient to constitute the serious provocation necessary to reduce the homicide from murder to voluntary manslaughter. *Id*. at 76.

¶ 42    The court stated that in Illinois, a spouse's adultery as provocation is limited to situations in which "the parties are discovered in the act of adultery or immediately before or after such an act, and the killing immediately follows such discovery." *Chevalier*, 131 Ill. 2d at 72. Addressing the legal requirements for provocation, our supreme court noted the appellate court correctly stated in *People v. Neal*, 112 Ill. App. 3d 964, 969 (1983), "Passion on the part of the slayer, no matter how violent will not relieve him from liability for murder unless it is engendered by a serious provocation which the law recognizes as being reasonably adequate. If the provocation is inadequate, the crime is murder. [Citation.]" The only categories recognized of serious provocation are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *Chevalier*, 131 Ill. 2d at 71. Words, no matter how aggravated, abusive or indecent, are not enough. *Id*.

¶ 43    Looking at the facts of each case, the supreme court stated "[w]hatever may be the outer limits of the general rule that only the discovery of the parties in the act of adultery, or immediately before or after the act, will suffice as provocation, neither case falls within the

rule." *Id*. at 76. In the first of the consolidated cases, the victim left the defendant three times during their marriage to live with his best friend. *Id*. The night before he shot his wife, the defendant discovered her soiled underwear in his car, but he did not confront her. *Id*. The next night, he confronted her and said more than once that he knew she was " 'messing around.' " *Id*. Similarly, in the second case, the defendant testified that he had suspected his wife of cheating for months before the murder. *Id*. Based on these facts, the supreme court held that neither case could "possibly come within the rule." *Id*.

¶ 44    Luis argues he discovered Sandra "in the act of adultery or immediately before or after such an act," in that he witnessed her affair on her cell phone in photographs and sexually explicit text messages. Luis argues that "[i]n this technological era, this visual discovery of the affair is the same as walking into the room to discover the affair." Luis argues he presented evidence of provocation sufficient to instruct the jury on second degree murder and let the jurors reconcile the facts. But, under Illinois law, the defendant's sudden fit of rage must be incited from catching his or her spouse red-handed (Latin term is *in flagrante delicto*).

¶ 45    Luis did not come upon his wife and her lover engaged in an act of adultery; all of the evidence established that Luis learned of the adultery from Sandra's cell phone and through her later admission when confronted. A confession of adultery by a spouse is not legally adequate provocation. See *Chevalier*, 131 Ill. 2d at 71-72 ("The rule that mere words are insufficient provocation applies no matter how aggravated, abusive, opprobrious or indecent the language."). The trial court properly refused to instruct the jury on second degree murder because the only evidence of the affair was "mere words."

¶ 46    In considering the provocation argument, we note, although not at issue here, questions regarding the continued availability of the defense of serious provocation based on adultery with the offender's spouse. Some commentators have noted that treating sexual jealousy by a married offender as a justification for reduced second degree murder charges is a throwback to an earlier era when courts condoned violence in the name of infidelity and that it reflects both gender and marriage bias. See Bureau of Justice Statistics, United States Department of Justice, Intimate Partner Violence, 1993-2001 (2003) (men three times more likely to kill intimate partner than women); *People v. Strange*, 81 Ill. App. 3d 81, 88 (1980) (provocation by adultery unavailable as defense when defendant and victim not married at time of murder); Carolyn B. Ramsey, *Provoking Change: Comparative Insights on Feminist Homicide Law Reform*, 100 J. Crim. L. & Criminology 33 (2010) (discussing abolition of adultery as provocation defense in three Australian jurisdictions and prospects for reform in United States).

¶ 47                                                    Mutual Combat

¶ 48    Luis contends he was legally entitled to a second degree murder instruction because he offered sufficient evidence that he and Sandra engaged in mutual quarrel or combat during the incident.

¶ 49    Mutual combat is " 'a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat.' " *People v. Thompson*, 354 Ill. App. 3d 579, 588 (2004) (quoting *People v. Austin*, 133 Ill. 2d 118, 125 (1989)). Provocation by mutual combat will not be found if the manner in which the accused retaliates is out of proportion to the provocation. *Austin*, 133 Ill. 2d at 127. If the defendant instigates the fight, he or she cannot rely on the

victim's response as evidence of mutual combat (*People v. Delgado*, 282 Ill. App. 3d 851, 859 (1996)), and mutual combat will not be found if "sufficient time had lapsed between the alleged provocation and the homicide to permit the voice of reason to be heard" (*People v. Coleman*, 124 Ill. App. 3d 285, 289 (1984)).

¶ 50    Luis argues that the record contains sufficient evidence to support a conclusion that Sandra, who was under the influence of cocaine, fought him. Luis claims, based on the evidence, the jury could have reasonably found that the blows which the medical experts held were the cause of Sandra's death were the result of her hitting her head when Luis threw her off of him as she ran toward him as the aggressor. We disagree.

¶ 51    The record shows Luis to be the aggressor. He initiated the fight. He responded disproportionately to the alleged provocation. Indeed, the extent and severity of Sandra's injuries show she was not on equal terms with Luis. Sandra was severely beaten during a prolonged struggle, suffering extensive injuries all over her body and face, including severe head injuries that led to her death. Luis sustained only a scratch to his right forearm and abrasion on his left elbow.

¶ 52    Luis's brutal beating of Sandra was completely disproportionate to Sandra's alleged conduct. Luis testified he confronted Sandra about her cocaine use and alleged affair and struck her first by slapping her when she admitted her infidelity. His self-serving testimony also included statements that Sandra locked herself in the bedroom at one point and curled up in a fetal position at another to cover herself from additional blows. Luis admitted he was bigger and stronger than Sandra. Even if Luis's statements that Sandra ran at him swinging are true, the manner in which he retaliated was completely out of proportion to her conduct. Nor was there evidence that Sandra entered willingly into the physical fight. The trial court did not abuse its discretion by holding Luis was not entitled to a second degree murder instruction based on provocation by mutual combat.

¶ 53                              Evidence of Prior Bad Acts

¶ 54    Luis contends the trial court erred in allowing the State to introduce evidence of his prior act of violence toward Sandra. Luis claims the evidence is improper proof of his intent to kill Sandra when he confronted her about the affair.

¶ 55    Liliana Almazan testified that she saw Luis slap Sandra on the side of her head during a party. The State used this evidence of a prior act of violence to refute Luis's theory that he committed the murder while under a sudden passion.

¶ 56    Generally, evidence of other acts of misconduct committed by a defendant are not admissible as proof of the defendant's propensity to commit crime, however, evidence of a defendant's prior acts of violence toward a victim can be admitted as proof of the defendant's intent at the time of the commission of the offense charged. *People v. McCarthy*, 132 Ill. 2d 331, 343-44 (1989).

¶ 57    Almazan's testimony regarding Luis's prior act of violence toward Sandra tended to show his intent to harm her. This evidence supported the State's theory that Luis's acts were motivated by anger and that he did not commit the homicide while acting under a sudden passion. At issue was Luis's intent and, therefore, the evidence was relevant. We find no abuse of discretion in the trial court's decision.

Request for Additional Instructions

¶ 59     Luis requests a new trial, claiming the trial court erred when it denied his request to instruct the jury on involuntary manslaughter, aggravated battery, and domestic battery. It is proper to instruct a jury on a lesser offense when some credible evidence has been presented to support the instruction. *Jones*, 219 Ill. 2d at 31.

¶ 60                          Involuntary Manslaughter

¶ 61     Luis argues the facts support giving an involuntary manslaughter instruction because the jury could rationally find his acts were reckless and that he did not intentionally kill Sandra.

¶ 62     The offenses of first degree murder and involuntary manslaughter require different mental states. Involuntary manslaughter requires one to be less culpable than first degree murder. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). An individual commits involuntary manslaughter when he or she performs acts that are "likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2010). The individual acts recklessly "when [he] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow." 720 ILCS 5/4-6 (West 2010).

¶ 63     In *People v. DiVincenzo*, 183 Ill. 2d 239 (1998), the supreme court discussed factors to consider in determining whether a defendant's conduct was reckless such that a jury instruction on involuntary manslaughter should be given. The factors include:

> "(1) the disparity in size and strength between the defendant and the victim [citations]; (2) the brutality and duration of the beating, and the severity of the victim's injuries [citations]; and (3) whether a defendant used his bare fists or a weapon." *Id*. at 251.

The court cautioned that "an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly." *Id*.

¶ 64     In requesting the involuntary manslaughter instruction, the defense argued a lack of evidence that Luis intended to kill Sandra. The defense characterized as reckless Luis's throwing Sandra against the refrigerator and wall, and pointed out that he did not use a weapon, did not strangle Sandra, and did not engage in acts known to kill.

¶ 65     Under this record, the trial court properly refused to give an involuntary manslaughter instruction. Luis's size and strength when compared with Sandra's does not support finding he acted recklessly. Luis weighed 30 pounds more than Sandra, and he admitted that he was stronger. Moreover, the nature and extent of Sandra's injuries does not support a finding of recklessness. Sandra's autopsy revealed 27 external evidences of injury with extensive bruising over her entire body. She sustained a subdural hemorrhage to the skull and cerebral edema to the brain.

¶ 66     We agree with the State that the evidence shows Luis intended to hit Sandra and slam her into the refrigerator, wall, and floor. Luis knew there was a strong probability that Sandra would suffer great bodily harm or death from the extensive beating. The trial court properly refused the instruction.

¶ 67               Aggravated Battery and Domestic Battery

¶ 68     Luis argues evidence supports an aggravated battery and domestic battery instruction and, therefore, the trial court erred in refusing to instruct the jury accordingly. The State maintains

the evidence would not have allowed the jury to rationally find Luis guilty of aggravated battery or domestic battery, but acquit him of first degree murder.

¶ 69    In certain circumstances, a defendant is entitled to have the jury instructed on less serious offenses that are included in the charged offense. *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). The practice gives an important third option to a jury–if the jury believes the defendant is guilty, but unsure the State has proven the charged offense, the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense. *Id*.

¶ 70    In deciding whether a defendant is entitled to an instruction on a lesser-included offense, Illinois courts apply a two-tiered charging instrument approach. *Ceja*, 204 Ill. 2d at 360. First, the court determines whether the charging instrument describes the lesser offense. *Id*. The instrument charging the greater offense must at least contain a broad foundation or main outline of the lesser offense. *Id*. " 'Second, if the charging instrument identifies a lesser-included offense, evidence adduced at trial must rationally support the conviction on the lesser-included offense.' " *Id*. (quoting *People v. Baldwin*, 199 Ill. 2d 1, 6 (2002)). Considering the evidence, the court determines whether it would allow the jury to rationally find the defendant guilty of the lesser-included offense, but acquit on the greater offense. *Ceja*, 204 Ill. 2d at 360.

¶ 71    The trial court acknowledged that aggravated battery and domestic battery can be lesser-included offenses of first degree murder, but denied defendant's request for the instructions, holding the evidence did not support giving either one. The trial court held, "the evidence would not support, I believe, a finding of not guilty, and in its place only a finding of guilty as to the included offense."

¶ 72    The State argues that domestic battery is not a lesser-included offense of murder because there is an additional element of "family or household member" that cannot be reasonably inferred from the charging instrument. The State further argues that contrary to Luis's assertion, the State did not concede this issue at trial, but instead argued that the evidence did not warrant either the aggravated battery or domestic battery instruction.

¶ 73    We agree with the trial court that the evidence did not warrant either instruction and, therefore, need not address whether the trial court properly concluded both aggravated battery and domestic battery were lesser-included offenses of first degree murder.

¶ 74    The jury could not have found Luis guilty of aggravated battery or domestic battery but acquit him of first degree murder where Sandra died as a result of the beating. Luis admitted that he deliberately hit Sandra repeatedly and threw her into the refrigerator and floor. He admitted that the beating caused Sandra's injuries. Both medical experts testified Sandra died from bronchopneumonia due to blunt force trauma from assault. Each believed that the manner of death was homicide.

¶ 75    Luis argues enough evidence indicates that the cocaine in her system could have caused her symptoms and death. His argument, however, misconstrues the evidence.

¶ 76    Although Sandra's toxicology test was positive for cocaine, both Drs. McElmeel and Humilier testified cocaine did not play a role in Sandra's death. Hence, the only evidence of causation is that Sandra died as a result of the blunt trauma she sustained from Luis's beating.

¶ 77    The trial court properly denied Luis's request for the lesser-included instructions.

¶ 79        Defense counsel objected to the use of the photographs of Sandra's injuries as they appeared when she was admitted to the hospital and during her autopsy (People's Exhibits 3 through 23 and 28 through 30) and, more specifically, People's Exhibits 29 and 30. Luis contends the photographs should have been excluded or limited by the court because they were unduly prejudicial and inflammatory.

¶ 80        Whether a photograph of a victim's injuries should be admitted falls within the trial court's discretion and, as a reviewing court, we will not disturb that decision absent an abuse of discretion. *People v. Terrell*, 185 Ill. 2d 467, 495 (1998) (citing *People v. Henderson*, 142 Ill. 2d 258, 319 (1990)). If the photographs are relevant to prove any fact at issue, they may be admitted and shown to the jury unless they are so prejudicial and likely to inflame the jurors' passions that their probative value is outweighed. *Henderson*, 142 Ill. 2d at 319. Even gruesome or disturbing photographs may be admitted if they are "relevant to establish any fact [at] issue." *People v. Lucas*, 132 Ill. 2d 399, 439 (1989). "Photos of a deceased victim may be utilized to prove the nature and extent of the injuries, the force necessary to inflict the injuries, the position, location, and condition of the body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." *Terrell*, 185 Ill. 2d at 495 (citing *Henderson*, 142 Ill. 2d at 319-20).

¶ 81        Before Dr. Humilier testified at trial, the parties discussed, outside the presence of the jury, the photographs the State intended to use during his testimony. Defense counsel objected and specifically requested that People's Exhibits 29 and 30, two autopsy photographs of the internal injuries to Sandra's head, not be published to the jury. Defense counsel argued the photographs, which reflected Sandra's peeled-back scalp and brain, were "too prejudicial, too gross." The State argued the photographs were more probative than prejudicial because Sandra's cause of death was disputed. The State further argued the best way to show the extent of Sandra's brain injuries was the photographs.

¶ 82        The court allowed the photographs during Dr. Humilier's testimony. People's Exhibits 29 and 30 were admitted into evidence and published to the jury. During his testimony, Dr. Humilier stepped off the stand and used the photographs to help describe Sandra's injuries.

¶ 83        The record shows that while the defense did object to the use of the photographs at trial, the alleged error was not included in defendant's posttrial motion. Both an objection and a written posttrial motion raising the issue are necessary to preserve the issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Moreover, defendant has failed to include the photographs in the record on appeal. As the appellant, the burden falls on defendant to present a sufficiently complete record to support his claims of error and any doubts arising from the incompleteness of the record are to be resolved against him. *People v. Murray*, 254 Ill. App. 3d 538, 551 (1993). Despite filing a motion to supplement the record with the photographs at issue, which we granted, and including the same request in his reply brief, albeit it on a page that was originally missing, defendant failed to ensure the photographs were included in the record on appeal. Accordingly, because we are unable to look at the photographs, we must assume they were properly admitted. See *People v. Pertz*, 242 Ill. App. 3d 864, 905 (1993) (court held defendant's failure to include photographs in the record precluded their examination, stating "[t]hat he would present the argument he has raised here regarding the gruesomeness of the

photos without making certain the photographs were included in the record in the first place is incomprehensible").

¶ 84    Parenthetically, we note, the State is entitled to prove every element of the offense when a defendant pleads not guilty, as Luis did here. See *People v. Starks*, 287 Ill. App. 3d 1035, 1042 (1997) (even though defendant did not dispute the cause of death, autopsy photos were relevant to establish cause of death and, therefore, admissible despite gruesome nature). Moreover, contrary to his claims now, Luis challenged Sandra's cause of death at trial. The defense questioned the medical experts extensively regarding drug toxicity after emphasizing in opening arguments that Sandra had done cocaine that night. The defense's theory was that Sandra's brain injury could have been caused by a cocaine overdose.

¶ 85    The autopsy photographs concerned elements of the offense the State had to prove beyond a reasonable doubt–that Luis performed acts that caused Sandra's death. The photographs, although graphic, were relevant to show the extent and nature of Sandra's injuries, as well as the cause and manner of her death. The photographs aided the jury in understanding the medical testimony. Forfeiture aside, the trial court did not abuse its discretion in allowing the photographs to be published to the jury.

¶ 86                            Limitation on Cross-Examination

¶ 87    Lastly, Luis argues the trial court improperly limited his cross-examination of Liliana Almazan about a misdemeanor battery conviction stemming from a physical fight she had with his niece, Crystal Viramontes.

¶ 88    The State maintains Luis forfeited this argument by failing to provide an adequate offer of proof regarding this testimony. Forfeiture aside, the State contends the trial court properly limited cross-examination of Almazan because the questions were irrelevant.

¶ 89    Almazan testified for the State concerning a prior act of physical violence she witnessed by Luis against Sandra. Before she testified, the parties conferred on the admission of her prior battery conviction concerning a fight she had with Crystal in June 2010. Crystal did not testify at Luis's trial.

¶ 90    Luis sought to cross-examine Almazan about the fight, not the conviction, to show she was biased and had motive to lie. Luis argued that because Almazan had a child with Sandra's brother, the fight with his niece would show the hostility between the two families and Almazan's bias.

¶ 91    The sixth amendment includes the right to cross-examine a witness concerning their biases, interests, or motives to testify. *People v. Frieberg*, 147 Ill. 2d 326, 357 (1992). Limitations on cross-examination fall within the sound discretion of the trial court and will not be overturned unless there has been a clear abuse of that discretion that was prejudicial to the defendant. *Id.*

¶ 92    The trial court did not abuse its discretion in precluding Luis from cross-examining Almazan about the fight she had with his niece. Even assuming error, we find that it was harmless beyond a reasonable doubt, where Luis was able to bring out Almazan's motive to lie in favor of Sandra by informing the jury she had a child with Sandra's brother and a close relationship with Sandra. The trial court's limitation on the use of the battery evidence under these circumstances could not have contributed to Luis's conviction. We find no error.

¶ 93                                CONCLUSION

¶ 94        Luis received a fair trial. The trial judge properly instructed the jury and followed the law.

¶ 95        Affirmed.