NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 8, 2020
Decided July 13, 2020

**Before**

DIANE P. WOOD, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 20-1249

| | |
|---|---|
| LUIS VIRAMONTES, *Petitioner-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:18-cv-04929 |
| CHRISTINE BRANNON, *Respondent-Appellant*. | Mary M. Rowland, *Judge*. |

**O R D E R**

An Illinois jury found Luis Viramontes guilty of the first-degree murder of his wife, Sandra. In a state postconviction petition, Viramontes asserted that his trial counsel was ineffective for failing to call a medical expert to testify that Viramontes did not use "substantial force" when he beat Sandra shortly before her death and that something else (such as cocaine toxicity) caused her death. The state appellate court concluded that counsel's decision to confront the medical evidence by cross-examining the State's witnesses was not unreasonable or prejudicial. The district court denied Viramontes's petition for a writ of habeas corpus, and we affirm.

## I. Background

### A.      Criminal Trial and Direct Appeal

Viramontes testified that on January 9, 2010, he and Sandra celebrated his birthday with family and friends while Sandra's mother watched their two children. On the drive home, Viramontes noticed that Sandra received a text message, which he thought was odd, given the late hour. So, after he carried Sandra inside (she had fallen asleep), he returned to the car and checked her phone. There, he discovered sexually explicit text messages that Sandra had exchanged with "Denise." Sandra had asked to meet with "Denise," and, after "Denise" requested pictures, Sandra replied with images of herself naked, to which "Denise" replied, "You're making me hard."

Viramontes testified that seeing the messages made him feel "like [his] whole life was turned upside down." He attempted to call "Denise" but received no answer, so he went inside to confront Sandra. He found her in the bathroom, snorting cocaine. While arguing about the drugs and the texts, Sandra revealed she was having an affair with "Denise," a male former coworker.

Viramontes testified that he was "angry" and "devastated," so he hit Sandra's face with his open hand. After Sandra locked herself in the bedroom, Viramontes retrieved spray paint and scrawled explicit messages about the affair on the living room walls. He then sat at the kitchen table and cried.

When Sandra saw the spray-painted walls, she ran at Viramontes, screaming and swinging. She hit his chest, so he grabbed her by the shoulders, threw her against a door, and then tossed her over the table. Viramontes told Sandra that he was leaving, but she ran at him again, so he threw her against the refrigerator and onto the floor. As he walked toward the door, Sandra threw her wedding ring at him and said that she did not want to be married. She also revealed that when Viramontes had driven her to a "cancer-screening" appointment months earlier, she actually had obtained an abortion.

At that point, Viramontes testified, he "lost it" and "couldn't control" himself. He threw Sandra against the refrigerator again, causing her to hit her head "hard." He then threw her onto the floor, where she hit her head again. While she was lying in the fetal position, trying to cover herself, Viramontes hit her face with his hands four to five times. Viramontes maintained that, throughout this, he was not trying to kill Sandra. So even though he was close to potential weapons, like knives, pots, and pans, he did not use them.

Eventually, Viramontes went outside, called his brother, Fernando, and asked him to come over. Back inside, Viramontes testified, he found Sandra in bed. He asked if she was all right, and she responded, "Babe, I'm sorry." He replied that he was sorry too. She asked him to lie next her, which he did, and she hugged him and told him that she loved him before falling asleep.

Fernando testified that when he arrived at the house, he saw the spray-painted walls and Sandra lying in bed. She did not look hurt, he said. When Fernando asked what had happened, Viramontes replied, "I trusted her," and confessed that he had hit Sandra. Fernando suggested that Viramontes lie down with Sandra and comfort her.

Early the next morning, Viramontes woke Fernando and told him that Sandra was not breathing properly. Fernando ran to the bedroom and discovered Sandra breathing heavily while mumbling and moaning. He now noticed redness on her face, shoulders, and chest, and he saw blood on a nearby mirror and the bed sheet. Viramontes instructed Fernando to call an ambulance, which he did. According to Fernando, Viramontes was "very nervous, shocked, [and] confused," so Fernando instructed him to leave.

At the hospital, Sandra was placed on life support, and she remained in a coma until she died three weeks later. Viramontes turned himself in to the police a few days after Sandra was admitted to the hospital.

At trial, the State presented two medical witnesses, Dr. David McElmeel, who treated Sandra in the hospital, and Dr. Michel Humilier, who performed Sandra's autopsy. Dr. McElmeel testified that when Sandra was admitted, she had extensive bruising on her body and face, decreased consciousness, and severe edema (swelling) in her brain. He found bilateral subdural hematomas (bleeding on the surface of both sides of her brain), which he concluded were caused by blunt force trauma to her head. She also had lacerations on the bridge of her nose, forehead, and right ankle. Dr. McElmeel concluded that the use of "severe force" had caused Sandra's injuries. Dr. Humilier agreed, concluding that Sandra's cause of death was bronchopneumonia due to blunt force trauma and ruling her death a homicide.

During cross-examination, Dr. McElmeel and Dr. Humilier each acknowledged that Sandra's toxicology screen was positive for a high level of cocaine, but both opined that cocaine did not cause her death. Nonetheless, Dr. McElmeel noted that Sandra had high blood pressure when she was admitted, which could have been related to cocaine toxicity or her head injury. And Dr. Humilier confirmed that cocaine could cause brain

swelling (like Sandra's). Defense counsel further obtained concessions from both doctors that Sandra had no trauma to her neck, no internal injuries to any organ other than her brain, and no broken bones or fractures. And Dr. Humilier conceded that he could not determine whether bruising on Sandra's body (unlike the bruising on her face and head) resulted from trauma or merely hospital staff turning her while she was in a coma. Neither doctor testified that Sandra had any history of cancer.

At the end of the trial, defense counsel requested jury instructions for four lesser-included offenses: second-degree murder (based on three theories of provocation), involuntary manslaughter, domestic battery, and aggravated battery. The court refused them all and instructed the jury on first-degree murder only, i.e., that it should find Viramontes guilty if he performed acts that caused Sandra's death and he intended to kill her or cause her great bodily harm, or he knew that his acts would cause her death or would have a "strong possibility" of causing her death or great bodily harm.

While deliberating, the jurors stated that they were evenly split. The court told them to continue deliberating, and the jury eventually returned a unanimous verdict finding Viramontes guilty.

After the trial judge sentenced him to 25 years in prison, Viramontes (still represented by trial counsel) appealed on multiple grounds. He argued that the jury should have been instructed on involuntary manslaughter because he did not intend to cause Sandra's death, as shown by the fact that he did not use any weapons or strangle her. The appellate court rejected Viramontes's arguments, affirming the conviction and sentence. *People v. Viramontes*, 20 N.E.3d 25, 30 (Ill. App. Ct. 2014). It determined that an involuntary manslaughter instruction was not warranted because "the nature and extent of Sandra's injuries" and her relative defenselessness (Viramontes weighed 30 pounds more than Sandra's 104 and admitted that he was "stronger") showed that Viramontes's actions were not merely reckless. *Id.* at 37–38. The Illinois Supreme Court denied Viramontes's petition for review.

### B.      Postconviction Proceedings

In a state postconviction petition, Viramontes argued, in relevant part, that he was denied the effective assistance of counsel because his trial attorney failed to investigate or call an expert witness to rebut the State's medical evidence. Viramontes attached an affidavit from Dr. Larry Blum, a board-certified forensic pathologist, who concluded that Sandra's injuries did not support an inference that Viramontes intended to cause her death. As to Sandra's brain injuries, Dr. Blum averred that, contrary to

Dr. Humilier's testimony, it was "not necessarily true" that they were caused by "relatively significant force." First, he asserted, brain swelling "can be associated with even mild brain injury." And "a relatively minor insult to the brain" can cause swelling, as can cocaine use. Second, subdural hematomas like Sandra's "can occur as the result of a major or minor insult to the head and can be inflicted either intentionally or accidentally." Finally, two facts—that Sandra "was not immediately unresponsive" (according to Viramontes) and that she did not suffer "any fractures, including facial and skull fractures, scalp lacerations, or cerebral cortical contusions"—"strongly suggest[ed]" that Sandra's brain injury, "although clinically significant, could have been caused by something less than 'significant' blunt force." As to Sandra's bruises, Dr. Blum opined that they "did not contribute to her death in any significant way." And, he stated, it is "difficult to assess the amount of force used" to inflict bruises because bruising varies based on multiple factors. For instance, according to Viramontes's testimony, Sandra had cancer, and that disease may have increased her bruising.

Applying the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), the postconviction trial court concluded that Viramontes's petition was without merit and, on appeal, the Illinois Appellate Court, First District, affirmed. *People v. Viramontes*, 87 N.E.3d 364, 368 (Ill. App. Ct. 2017). The appellate court concluded that trial counsel's performance was not objectively deficient because counsel elicited valuable evidence from the State's witnesses on cross-examination. *Id.* at 376–77. Further, Viramontes was not prejudiced by trial counsel's failure to call an expert; Dr. Blum could not "unequivocally" testify that Viramontes "did not commit the crime" nor overcome the "overwhelming evidence against [Viramontes], including his own admissions." *Id.* at 377. And the trial court's refusal of an involuntary manslaughter instruction was not based solely on a lack of medical evidence; rather, the court also relied on the size disparity between Sandra and Viramontes, which Dr. Blum could not negate, so his opinion would not have "changed the trial court's mind." *Id.* The Illinois Supreme Court denied Viramontes's request to review his claims. *People v. Viramontes*, No. 122856 (Ill. 2018).

Viramontes then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, claiming only that trial counsel was ineffective for failing to call an expert to testify about the degree of force Viramontes used. The district court ruled that the state court's decision on this claim "was neither contrary to nor an unreasonable application of Supreme Court precedent." Although the district court disagreed that the evidence against Viramontes was "overwhelming," it nonetheless found the state court's

determination "defensible." But it granted a certificate of appealability on "the question of the state court's reasonable application of *Strickland*."

## II. Analysis

We review de novo a district court's denial of a petition for a writ of habeas corpus, but our inquiry is narrow. *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc), *cert. denied*, 140 S. Ct. 96 (2019). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court, reviewing the last state court decision to address the petitioner's claims on the merits, cannot issue a writ on a claim that the state court rejected unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2); *Hoglund v. Neal*, 959 F.3d 819, 832 (7th Cir. 2020).

As a threshold issue, one of the arguments Viramontes raises is not properly before us. Viramontes claims that the postconviction appellate court made "an unreasonable determination of fact" when it stated, erroneously, that defense counsel cross-examined the State's witnesses about the effects that cancer may have had on Sandra's injuries. But we will decide the merits of "only those issues included in the certificate of appealability." *Peterson v. Douma*, 751 F.3d 524, 529 (7th Cir. 2014) (listing cases). The district court did not grant a certificate of appealability on the state court's determination of fact, and Viramontes has not asked us to expand the certificate, *see id.* at 530 (usually counsel must ask for an expanded certificate before briefing additional issues).[1] Although some "special circumstances" justify departing from this practice—such as when the issue was not earlier apparent, the petitioner is proceeding pro se, or consideration now will prevent successive appeals—none exist here. *Id.*

Turning to the issue on which this appeal was certified, Viramontes claims that the state postconviction court unreasonably applied federal law when it rejected his

---

[1] Further, Sandra's "cancer" appears to be a red herring. The only evidence that Sandra had cancer is Viramontes's testimony; he testified that Sandra had suffered from Hodgkin's lymphoma since high school and she went to approximately three cancer-related doctor's appointments each year of their sixteen-year relationship. Dr. Blum's opinion is based on that testimony, not medical records. Thus, even if this issue were properly before us, we would conclude that counsel's failure to pursue the subject was not deficient or prejudicial because counsel may have reasonably forgone probing the issue for lack of proper foundation.

claim that his trial counsel was constitutionally defective. To prevail on that claim, Viramontes had to show (1) that counsel's decision not to call an expert was so deficient that it fell below the objective standard of reasonableness and (2) that he was prejudiced by it. *See Strickland*, 466 U.S. at 687. This is a high bar, made higher in this court because of the deference required by AEDPA. *See Ellison v. Acevedo*, 593 F.3d 625, 633 (7th Cir. 2010). It is not enough for Viramontes to show that the state court's application of *Strickland* was incorrect; he must show that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Viramontes argues that trial counsel was ineffective for two reasons. First, counsel failed to call a medical expert to rebut the State's evidence about the degree of force he used to cause Sandra's injuries and her cause of death. Second, based on a misapprehension of the law, counsel elicited harmful testimony from Viramontes in the futile pursuit of a second-degree-murder instruction based on the premise that Viramontes was provoked by Sandra's alleged extramarital affair and abortion.

Our discussion of the latter argument can be brief. It is unsurprising that, as Viramontes asserts, the state postconviction court overlooked it: at no level of state postconviction review did Viramontes argue that trial counsel's pursuit of the provocation theory was unreasonable. In most cases, a petitioner for a federal writ must first give state courts a fair opportunity to correct the alleged problem by presenting them with the operative facts and the controlling legal principles for each claim. *See* 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 33 (2004). Here, however, the State does not argue that Viramontes is barred from pursuing this theory, and procedural default is an affirmative defense. *See Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004). We can raise that bar ourselves, even when it is forfeited, under certain circumstances, *see id.* at 518–19, but we do not need to decide whether it would be appropriate to do so in this case. Even under de novo review (we have no state decision to defer to), Viramontes's argument fails.

The record demonstrates that counsel understood the law of provocation and made a strategic decision to argue for an extension of it. In his petition for leave to appeal to the Illinois Supreme Court, counsel argued that "with constant proliferation of technological devices being used to maintain relationships," the court should expand provocation to include "witnessing" of adultery via discovery of explicit electronic messages. This theory was not legally foreclosed, as Viramontes claims; the state appellate court refused to extend the doctrine based on a scholarly critique of it, not

precedent. *Viramontes*, 20 N.E.3d at 36 (citing Carolyn B. Ramsey, *Provoking Change: Comparative Insights on Feminist Homicide Law Reform*, 100 J. CRIM. L. & CRIMINOLOGY 33 (2010), for the proposition that "treating sexual jealousy" as a justification for reduced murder charges "is a throwback to an earlier era when courts condoned violence in the name of infidelity and ... reflects both gender and marriage bias"). Even though he was unsuccessful, our review of counsel's plausible strategic choices is "highly deferential." *Strickland*, 466 U.S. at 689. We will not second-guess counsel's decision to pursue this novel theory among the other theories of mitigation that he raised.

Turning to Viramontes's theory that trial counsel was ineffective for failing to call a medical expert, on the first *Strickland* factor the state appellate court determined that counsel's performance was not deficient because he obtained testimony from the State's witnesses on most of the issues that Dr. Blum raised and used those concessions to argue that Sandra was not severely beaten, that Viramontes did not intend to cause her death, and that cocaine toxicity actually caused her death. Viramontes contends that the state court unreasonably applied the deficiency prong because counsel had a duty to present expert testimony to counter the State's witnesses, not merely his own questions and arguments. *See Hinton v. Alabama*, 571 U.S. 263, 273 (2014).

Viramontes's argument that only one strategy was reasonable is untenable. "Rare are the situations" in which counsel is "limited to any one technique or approach." *Richter*, 562 U.S. at 106. Failing to consult or rely on experts can be deficient performance, but often cross-examination will be "sufficient to expose defects in an expert's presentation." *Id.* at 111. Thus, in *Richter*, the Supreme Court agreed that it was reasonable to find that counsel was not deficient for failing to call a rebuttal expert when he "conducted a skillful cross-examination" during which he "elicited concessions" from the State's witnesses and drew "attention to weaknesses in their conclusions." *Id.* Similarly, here, the state court determined that counsel's cross-examination was sufficient because he obtained numerous concessions from the State's witnesses and highlighted that they had failed to consider the influence of Sandra's extreme cocaine toxicity on her death. Thus, the state court's determination that counsel's performance was not deficient was reasonable. *See id.* at 106 (state courts have "wide latitude" in this determination).

Viramontes presses that the state court's decision is contrary to *Thomas v. Clements*, 789 F.3d 760, 763 (7th Cir. 2015), in which we found counsel's failure to call a rebuttal medical expert to testify about the amount of force necessary to cause a victim's death was deficient performance. Of course, "clearly established Federal law"

for the purposes of habeas review includes only the holdings of the United States Supreme Court, so whether the state court's decision was contrary to *Thomas* specifically is of no moment. *See* 28 U.S.C. § 2254(d); *White v. Woodall*, 542 U.S. 415, 419 (2014). *Thomas* is still helpful here, but not in the way Viramontes suggests. As the State points out, the review in *Thomas* was de novo because the last reasoned state court decision did not address counsel's performance. 789 F.3d at 768. So, although we determined that counsel's cross-examination did not make up for the lack of a rebuttal expert, we noted that, "[w]ere the state court's determination reviewed under AEDPA deference, we might come out a different way." *Id.* In this way, we acknowledged that a state court, looking at a similar set of facts, could reasonably come to a different conclusion. And that is what happened here.

Further, *Thomas* was a closer case. There, it was "undisputed that counsel did not reach out to or even consider talking to" an expert. *Id.* But here, the last reasoned state court decision rejected Viramontes's claim that defense counsel failed to investigate whether to call an expert witness, determining that counsel's cross-examination of the State's witnesses was born from pretrial investigation. Viramontes does not challenge that determination, and "strategic choices made after thorough investigation" are "virtually unchallengeable." *Hinton*, 571 U.S. at 274 (quoting *Strickland*, 466 U.S. at 690–91). Thus, the state court did not unreasonably determine that, after investigation, counsel made a reasonable, strategic choice to refute the State's medical evidence via cross-examination instead of through an expert.

It was also reasonable for the state court to conclude that the absence of an expert was not prejudicial. Prejudice in this context means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The state postconviction court concluded that, even if trial counsel had produced a rebuttal medical expert, there was not a reasonable probability of a different result because of the "overwhelming" evidence against Viramontes.

Viramontes protests that the evidence was not "overwhelming" as a matter of law because the jury was initially split, and so the state court's determination that he was not prejudiced was unreasonable. But a lack of overwhelming evidence does not mean that any error was prejudicial; it must be "reasonably likely that *the result of the trial* would have been different." *Richter*, 562 U.S. at 111, 113 (emphasis added). This proper standard governed the state court's analysis.

And the state court's determination under that standard was reasonable. Although Dr. Blum averred that Sandra's injuries may have been exacerbated by her cocaine use and (purported) cancer and could have been "the result of a major or minor insult" and "inflicted either intentionally or accidentally," this establishes nothing more than a "theoretical possibility" that Viramontes did not intend to cause Sandra's death. *See id.* at 112. The jury was presented with that same possibility and rejected it. Counsel elicited testimony that Sandra had no broken bones or injuries to any internal organ other than her brain. And Viramontes testified that, because he did not intend to kill Sandra, he did not strangle her or use available weapons. But there was substantial contrary evidence, including the disparity between Viramontes's and Sandra's sizes and Viramontes's testimony "that he threw Sandra against a door, over the table, and into the refrigerator, causing her to hit head … 'really hard.'" And there was strong evidence that Viramontes was enraged when he assaulted Sandra: he had spray-painted the walls of their home with explicit messages about her affair. Viramontes provides no reason to believe that a medical expert could have bolstered his defense enough to create a reasonable possibility of an acquittal in spite of the other evidence against him. Thus, it was not unreasonable for the state court to conclude that the evidence pointing to guilt eclipsed any potentially beneficial effect of a rebuttal medical expert. *See id.* at 113.

Viramontes insists that Dr. Blum's testimony would have supplied at least "some evidence"—all that is needed under state law—to support an involuntary manslaughter instruction. *See People v. McDonald*, 77 N.E.3d 26, 34 (Ill. 2016). And because the jury was given only a first-degree-murder instruction, it "resolve[d] its doubts in favor of conviction" because Viramontes was "plainly guilty of some offense." *See Keeble v. United States*, 412 U.S. 205, 212–13 (1973). The postconviction court reasonably concluded that Dr. Blum would not have convinced the trial court to grant an involuntary manslaughter instruction, however. The trial court's determination that there was no factual basis for that instruction was not due solely to the lack of medical evidence; the trial court reasoned that Viramontes did not act recklessly because Sandra was defenseless given her relative size and strength. So, the postconviction court reasonably concluded, Viramontes was not prejudiced by his counsel's failure to produce more medical evidence because it would not have negated the evidence that made an involuntary manslaughter instruction untenable.

Because, on the claim properly before this court, the state court reasonably concluded that the performance of Viramontes's counsel was not deficient or prejudicial, we AFFIRM.