In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-2949

KEITH HOGLUND,

*Petitioner-Appellant,*

*v.*

RON NEAL, Warden,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:16-CV-313-PPS-MGG — **Philip P. Simon**, *Judge.*

_____

ARGUED DECEMBER 4, 2019 — DECIDED MAY 14, 2020

_____

Before MANION, KANNE, and BARRETT, *Circuit Judges.*

MANION, *Circuit Judge.* A jury found Keith Hoglund guilty
of molesting his daughter. The district judge denied his peti-
tion for a writ of habeas corpus. We affirm.

## I. Overview

Hoglund married Teresa Malott in 1998. She already had
a 4-year-old son. The marriage produced two children. A.H.

was born in 1998; her sister in 2001. A.H. testified she twice tried to tell her mother her father was molesting her. After the second time, Mallot went to the police. This followed shortly after Hoglund told her he committed adultery. Detective Holliday interviewed A.H. in February 2006. She said her father had her perform oral sex on him. So Dr. Butler examined A.H. in March 2006. Holliday interviewed Hoglund, who denied the allegations but also made several strange and incriminating statements. Indiana charged him with child molesting. A.H. met with Counselor Shestak in 2007 and Dr. Mayle in 2009. At trial in 2010, A.H. testified Hoglund sexually abused her from the ages of 4 or 5 to about 7. Indiana called Butler, Shestak, and Mayle to testify. They relayed what A.H. told them and they essentially said they believed her. Hoglund also testified. He denied abusing A.H. But the jury found him guilty. The judge sentenced him to 50 years. After exhausting state proceedings, he petitioned the district court for a writ of habeas corpus. He raised two basic issues that survive for us.

First, he claimed ineffective assistance of counsel because his trial attorney failed to object properly to hearsay. Defense counsel made some hearsay objections when the prosecutor asked the experts to say what A.H. said. But when the prosecutor invoked the medical exception under Indiana Rule of Evidence 803(4), defense counsel failed to assert the lack of a foundation that A.H. thought she was speaking to the experts for diagnosis or treatment. The district judge decided defense counsel was deficient but the state court's holding that this did not prejudice Hoglund was not objectively unreasonable.

Second, he claimed the admission of the experts' vouching violated due process. Indiana precedent at the time of trial— *Lawrence v. State*, 464 N.E.2d 923 (Ind. 1984), *overruled by*

*Hoglund v. State*, 962 N.E.2d 1230 (Ind. 2012)—allowed limited, indirect vouching. Some instances of vouching at trial satisfied this precedent and were admitted. Others did not, but still came in. On direct appeal, the Indiana Supreme Court overruled *Lawrence* and banned indirect vouching. But the court denied Hoglund relief because the error was harmless. The district judge questioned the state court's harmless-error analysis, but concluded he could not find the determination that the error did not prejudice Hoglund was unreasonable.

So the judge denied the petition, but certified the appealability of these two issues and the issue of whether the due process claim was procedurally defaulted. Hoglund appealed.

## II. Trial

### A. A.H.

A.H. testified her father made her perform oral sex on him "maybe twice a week, three times a week" from the age of "[m]aybe 4 or 5" to about her seventh birthday. She gave graphic, grotesque, extensive, shocking details. She testified about all five senses, including the taste of her father's semen: "Slimy, gooey, disgusting." She told the jury the acts made her mouth sore. She testified he showed her pornographic movies of oral sex. She testified about his manipulation, her attempts to refuse, and his persistence in making her perform oral sex. She asked if he was ever going to do this with her sister because A.H. "didn't want her to go through it and he said I don't know, maybe." She was very concerned about her sister. She testified that after the abusive acts her father would have her eat food to change her breath.

On cross, defense counsel explored sibling rivalries and parental favoritism, and attempted to show Hoglund was a

good, normal family man. A.H. testified she learned from her mother that her father was cheating and they would divorce. A.H. was sad and disappointed. Defense counsel subjected her to extensive, aggressive, probing, even tedious cross, but her account remained materially consistent and strong.

On redirect, A.H. testified about the first time she told her mother about the sexual abuse. She was 5 or 6. Her mother had her sit in her room until her father came home. When he did, he talked with A.H. privately. He told her she could not tell anyone. She also testified about the second time she told her mother. This time, her mother contacted the police.

B. Dr. Carol J. Butler

The State called Dr. Butler, a pediatrician. She testified she saw A.H. in March 2006 at the request of D.C.S. for a sexual abuse exam, the purpose of which was to interview A.H., do a physical exam, and provide treatment if needed. The prosecutor: "[Y]ou asked her what she was there to see you for, what did she say?" Defense counsel objected to hearsay. The prosecutor invoked Indiana Rule of Evidence 803(4)'s exception for statements made for purpose of medical diagnosis or treatment. The court overruled the objection. Butler testified A.H. said she was in for a checkup. Butler continued:

> [S]he told me that her mom [asked] her if her dad was hurting her or doing something he shouldn't be doing and she said yes. … She said … her mom asked her … because "her dad was cheating on her mom and he was tired of her" … .

Butler then relayed A.H.'s account of the abuse. This graphic hearsay echoed A.H.'s testimony. Butler took a culture for chlamydia and gonorrhea from A.H.'s throat: negative.

The prosecutor asked Butler to indirectly vouch: "[D]o you believe that she is prone to exaggerate or fabricate sexual matters?" Defense objected. The prosecutor rephrased the question: "[D]id you believe that she is prone to exaggerate or fantasize in sexual matters?" Defense objected again, and lodged a continuing objection. The court overruled it. Butler strayed outside *Lawrence* and directly vouched:

> I don't believe an eight year old would come into a physician's office to speak about sexual fantasies or made up stories. … [F]or an eight year old to come in and speak about that in my opinion is not usually a fantasy or a story. To be seven or eight and to have this knowledge is also not usual. So I believe that what [A.H.] told me was the truth because of her age and because people don't—

Defense objected again. The prosecutor agreed, and tried to confine the expert to *Lawrence*. "Do you believe that [A.H.] was … prone to exaggerate or fantasize?" Butler: "In regards to what she told me, no." The court *sua sponte* struck the comment about whether A.H. was truthful and instructed the jury to disregard it, but allowed the opinion she was not prone to exaggerate or fantasize to stand.

C. Teresa Malott

The State called A.H.'s mother. She testified A.H. and Hoglund "were extremely close" when A.H. was young. She testified they were sometimes alone together, sometimes in the bedroom. "[H]e didn't like the other two kids would bother him, he wanted to keep the air conditioning running in the bedroom, so he would lock the rest of us out."

Malott testified 5-year-old A.H. told her something alarming: "[S]he came to me about bathing her father in the shower and other things that I can't recall at this time or can't recall at all which was very alarming." Malott called Hoglund at work about what A.H. said. He was upset and came home. He said it was not true, and would ruin him. Malott believed him, but stopped leaving A.H. alone with him. He did not bathe her anymore. But after a while Malott did not notice anything, so they resumed the routine. Prosecutor: "Did you ever ask [A.H.] again?" Malott: "Off and on, like twice after that did I ask her and she would say no." Defense counsel objected to hearsay. The court sustained the objection. Malott testified she did not suspect anything inappropriate was happening.

Years passed after the first red flag. In November 2005, Hoglund began working as a truck driver. In January 2006, he told Malott by phone he had an affair. She was "horrified," "[e]xtremely upset and angry." She decided to divorce. Soon after this call, Malott asked A.H. if "what she had told me before was true or not." A.H. cried. Without saying what A.H. said, Malott testified her own reaction to what A.H. said was to load her children and some supplies into a car and leave because he was returning. She told the police what A.H. said.

D. Christine Ottaviano Shestak

The State called Shestak, a mental health counselor who saw A.H. twice in January 2007. Shestak testified A.H. was referred for anxiety management as trial loomed, but did not here testify about A.H.'s purposes. The prosecutor asked if she perceived any indication A.H. "may have fabricated the story about her abuse out of some need?" Defense counsel objected but was overruled. Shestak, like Butler, strayed beyond *Lawrence*: "Her statements were congruent with her

experience and I did not see anything that indicated that she had any need to tell this story." But the court did not strike this direct vouching, despite striking Butler's direct vouching.

The prosecutor: "[W]hat did [A.H.] tell you during your interview with her?" Defense objected but said "I understand the exception." He did not argue no foundation supported it. The court overruled the objection. Shestak answered:

> I asked [A.H.] what exactly was the reason that she was here. She knew the trial was coming up, I asked her what the trial was about and at that point words just began to pour out of her really fast describing incidents of what she called washing her dad's penis and as I asked further questions I realized she was talking about oral sex. She gave me a great deal of detail. … Some of the details were that her mouth hurt and she would ask her dad to let her stop and he would urge her to go on just a little longer.

Shestak related many other graphic, grisly, lurid details A.H. had told her. These details echoed A.H.'s trial testimony.

A.H. drew her father's genital organ for Shestak. The prosecutor offered the drawing into evidence. Defense counsel objected to hearsay. The prosecutor relied on the medical exception, defense counsel failed to challenge foundation, the court overruled the objection, and the jury saw the drawing.

Shestak shed some light on A.H.'s early attempt around age 5 to tell her mother about the abuse:

> Her worst event was being called a liar and … she told me that that was when she had told her mother a couple years earlier before the final disclosure that, about the incident of oral sex with dad that mom had gone to

dad, dad had gotten very angry and then she was afraid of dad's anger so she then told her mother that it hadn't happened. She was then grounded for lying and that was her worst memory.

After yet more lurid, revolting hearsay, echoing A.H.'s testimony, the prosecutor asked: "[D]o you believe that she is prone to exaggerate or fantasize in sexual matters?" Shestak: "I did not feel there was any great exaggeration. I felt like she really didn't want to talk, but she felt like she had to." The prosecutor pressed on: "Did you learn anything from your interviews with the child … which would be inconsistent with [A.H.] being the victim of a sexual abuse?" No objection. Shestak: "No, I did not."

E. Detective Scott Holliday

The State called Holliday, who investigated the allegations and interviewed A.H. and Hoglund. He testified about incriminating statements Hoglund made:

> I told him that his daughter … made allegations that he put stuff on his penis and have her lick it off. … I believe his response was "No way". … I did ask him why he thought [she] would make such a statement. … [H]e [referred] to an incident … a few years back … where he had left a pornographic movie in the VCR … the next day … he came in from the garage and I believe what he told me he was horrified to see [she] was watching, his words "an oral sex movie" … .

Holliday also testified Hoglund said A.H. walked in on him and his wife having oral sex several times, but Hoglund could not give details. Holliday also testified Hoglund claimed A.H. walked in on him masturbating and ejaculating.

Holliday testified he asked if there was ever a time his daugh-
ter might have put her mouth on his genital organ:

> [W]hen I asked … if there was ever a time when she
> put her mouth on his penis, he had made comment that
> not unless [he] was passed out sleeping and [she] took
> it upon herself. … He had also told me that there had
> never been a time … where he was coherent that it hap-
> pened. … [H]e had also made statement to that same
> question that he had been trying to think back over
> time, but couldn't recall this happening, he had also
> made comment that he was trying to think if it could
> have happened when he was f*cked[1] up. … His words.

Holliday was present when A.H. testified. The prosecutor
asked him if her testimony was consistent with what she said
at the interview in February 2006. He said it was.[2]

F. Dr. Amanda Mayle

The State called Dr. Mayle, a clinical psychologist. She tes-
tified she saw A.H. in July and August 2009 because the pros-
ecutor asked for an assessment of emotional stability and abil-
ity to testify. Mayle found her able to testify. The prosecutor
asked Mayle to say what A.H. said. This time, defense counsel
did not object to hearsay, though no foundation supported
the exception. Mayle testified:

> [A.H.] stated … the abuse start[ed] when she was
> around 4 or 5 [and] ended when she was close to 8. She

---

[1] The trial transcript, of course, spells out the word.

[2] Defense counsel made no objection here. Indeed, defense counsel
had the witness reiterate the comparison on cross examination. And
Hoglund raises no quarrel on this point to us.

said "He made me suck his privates." She also said …
her dad had a red box with little bottles that were dif-
ferent flavors [and] he would wipe this on his privates
before he would make her suck his privates. … She
said afterward he would give her money and some-
thing to eat like a brownie to change the smell of her
mouth. … She also stated that he would tell her not to
tell because "Daddy would go to jail and you wouldn't
want that." She also stated that he would often grab
her neck while she was sucking his privates and that
she to this day hates when people touch her neck and
that it kind of makes her have triggers of past events.
She also stated that she asked him if he would ever do
this to her little sister and he stated maybe. She said
that made her very angry, she didn't like that. Stated
that she … told her sister during a secrets game and
that she had told her mom too and that … her mom
had talked to her dad about it and that he had pulled
her in her room later and told her not to tell and threat-
ened her and told her … they were still going to do it
and she told him that she didn't want to because she
didn't like to do it anymore and … he had smacked her
in the face and left a red mark. She also stated that she
was afraid because she thought … one of dad's friends
tried to run her over with a red van … .

Mayle relayed what she says A.H. said, echoing her testi-
mony and adding new details.[3] The prosecutor asked: "[D]o

---

[3] A.H. did not testify about her father grabbing her neck or smacking
her face, telling her sister about the abuse, or a red van; no one asked her
about these details at trial. On appeal to us, Hoglund does not raise a par-
ticular challenge to these details.

you perceive any indication that [A.H.] may have fabricated this story of her abuse out of some need?" Over an overruled objection, Mayle said no. The prosecutor asked if she believed A.H. was prone to exaggerate or fantasize in sexual matters. Mayle said no. The prosecutor nudged Mayle further: "Did you learn anything about [A.H.] which you believe would be inconsistent with the victim being a victim of sexual abuse?" No objection. Mayle said no. The State rested.

G. Hoglund

Hoglund took the stand. He testified about activities with his children, his work, and his decision to be a truck driver. He left for the road in November 2005. He returned Christmas Day with gifts. He left the next day. He testified he cheated. He told his wife on the phone in January 2006. "[S]he was extremely pissed off, screaming at me on the phone, called me every name in the book … ." He testified about an incident when he claims he accidentally left a pornographic movie featuring oral sex in the VCR and A.H. watched it:

> [M]y Friday nights I usually went out blowing off steam from work and I came home, everybody was in bed and we had these x-rated movies and I just popped one in and I started watching it and you know I took care of what I needed to take care of and then I went off to bed. The next day I'm out in my garage … and my wife … came out and said she was going to the store and I was like yeah, okay, whatever, where are the kids and she was like oh they are in the yard … . So I went about my business … . [T]hen I thought well I better go make sure everything is alright and I needed to get a drink anyway, so I walked into the house to my horror there's my little girl watching this movie

that I had left in the VCR. … I basically wanted to kick my ass for leaving it in there, pardon my language. I was horrified, I was lowered … I would never, never bring my daughter in to watch a movie like that.

Hoglund also testified about an incident when he claims A.H. saw him ejaculate:

The wife and kids were at the store, nobody was home and I thought it would be a perfect opportunity to relieve myself and low and behold I didn't hear them coming in, in walks in [A.H.] and you know I turned away, I told her you need to get out of here, basically I got caught.

He also testified about an incident when he claims A.H. saw him and his wife engaging in oral sex.

He testified that when Holliday confronted him with A.H.'s accusations, he "was devastated … instantly angry, shocked, couldn't understand where these allegations would come from." He gave explanations for his strange statements.[4]

---

[4] **Hoglund:** "Holliday … asked me if I thought at one point if I might have been messed up enough to do something like this with my kids."
**Defense counsel:** "How did you respond to that?"
**Hoglund:** "Never. … I couldn't do that to a kid."
**Counsel:** "Also there were two statements … made by you and one of them … was that my daughter knows more about sex than we do, how was that statement made by you at the time?"
**Hoglund:** "I was mad, I was frustrated, I had just been delivered a bomb so to speak. It was a bit of an exaggeration."
**Counsel:** "There was another question … which your response … was 'Unless I was passed out and she on her own would have done something like that' … . Would you please explain that response?"

Hoglund unequivocally denied the allegations. Defense counsel asked how he felt hearing A.H. say she put her mouth on his genital organ. "I was hurt, I was stunned, I wondered how my baby girl could say this about me, what did I ever do." Defense counsel asked if he ever had A.H. put her mouth on his genital organ and put flavoring on it. "I never did. I never would, I find that disgusting, appalling and that's my baby girl. I mean I use to feed her, change her diapers, she was my first baby. I would never hurt my kids. I swear to God I wouldn't." Defense rested. The jury convicted.

### III. Further Proceedings

A. Direct Appeal to Indiana Court of Appeals

Hoglund appealed, challenging the vouching by the experts. In its decision, the Indiana Court of Appeals quoted the experts' testimony at length, including several passages of direct or arguably direct vouching. Here are highlights:

**Butler:** "So I believe that what [A.H.] told me was the truth because of her age and because people don't—"

**Shestak:** "Her statements were congruent with her experience … ."

---

**Hoglund:** "[M]y mind was spinning in so many different directions from absorbing the information [he] was giving to me and he was explaining … the things that he had seen in his career … and … that was basically an exaggeration … like my daughter knowing about as much sex as … an adult … . I felt like he was trying to say well what about on a subconscious level, you know no, that would never happen consciously, unconsciously, drunk, stoned, whatever I would never, ever do that to my daughter or any child for that matter. … I was stunned basically the whole time I talked to him. I don't know how to explain it, but I have never been faced with anything in of that nature and to hear something like that … my mind just went 100 miles a minute, numb I guess."

**Mayle:** "No [I did not perceive any indication A.H. may have fabricated this story of her abuse out of some need.] … No [I did not learn anything about A.H. which I believe would be inconsistent with a victim being a victim of child abuse]."

Yet the appellate decision suggested Hoglund was not challenging any direct vouching: "In any event, Hoglund does not dispute that the evidence at issue here is indirect vouching by an expert under *Lawrence*. He argues, however, that *Lawrence* is no longer good law." *Hoglund v. State*, 945 N.E.2d 166, 171 (Ind. Ct. App. 2011). But the Indiana Court of Appeals found itself bound by *Lawrence* and concluded the trial court did not abuse its discretion in admitting indirect vouching for A.H. The concurrence expressed concern about the direct vouching and the avalanche of accumulating vouching. But the concurrence recognized "there is no entitlement to a perfect trial." *Id.* at 176 (Darden, J., concurring) (internal quotation marks omitted). The concurrence concluded the vouching was not so prejudicial as to require reversal, given the "articulate and detailed testimony of A.H." and given "Hoglund's own testimony as to how A.H. would not have been aware of such details without having personally experienced them with him … ." *Id.*

B. Direct Appeal to Indiana Supreme Court

At the next step, the Indiana Supreme Court granted Hoglund a hollow victory by overruling *Lawrence* but still affirming. The court ruled testimony that an alleged child victim is not prone to exaggerate or fantasize in sexual matters is an indirect but functional equivalent of saying the child is telling the truth. Thus the court overruled *Lawrence* and joined the majority of States. The court held the trial court erred in allowing vouching into evidence over Hoglund's objection.

But the court concluded the improper admissions were harmless errors because there was substantial evidence of guilt apart from the erroneously admitted vouching: "A.H. testified at length concerning what happened to her at the hands of her father. And her testimony remained consistent and unshaken under aggressive cross examination." *Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2012). Also, the court found the erroneously admitted-over-objection vouching to be cumulative of other vouching admitted without objection.

C. State Petition for Post-Conviction Relief

Hoglund petitioned for post-conviction relief and lost. On appeal, he argued his trial counsel rendered ineffective assistance by failing to object to all expert vouching testimony, failing to seek a mistrial because of direct and overt vouching by Butler, and failing to object properly to hearsay. The Indiana Court of Appeals correctly recited the *Strickland* test, as restated by the Indiana Supreme Court: "To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hoglund v. State*, 46 N.E.3d 1284, No. 90A02-1503-PC-182, 2016 WL 453549, at *2 (Ind. Ct. App. Feb. 5, 2016) (internal citations omitted), *transfer denied*, 49 N.E.3d 107 (Ind. 2016).

The court first turned to Hoglund's claim that trial counsel performed deficiently by failing to object consistently to

vouching. Trial counsel objected to some vouching, but not all. But the court observed that at the time of trial, *Lawrence* permitted indirect vouching, so the trial court would have overruled even consistent and thorough objections to indirect vouching, so the failure to make consistent and thorough objections to indirect vouching was not ineffective assistance.

The Indiana Court of Appeals then turned to Hoglund's argument that trial counsel was deficient by failing to seek a mistrial after Butler directly vouched for A.H. by testifying, "I believe that what [A.H.] told me was the truth because of her age … ." Trial counsel lodged an objection here, and the prosecutor even agreed on record. The trial court struck the testimony and admonished the jury to disregard it. The Court of Appeals concluded the trial court timely and properly admonished the jury, which presumably cured any error regarding the testimony. The Court of Appeals also concluded the trial court would have denied any request for a mistrial at this point, as mistrial is an extreme remedy granted only when nothing else can rectify the situation. Thus, trial counsel's performance on this point was deemed effective.

Finally, the court turned to Hoglund's claim that trial counsel failed to object properly to the hearsay testimony of Mayle and Shestak. Trial counsel objected several times to the hearsay, the prosecutor claimed admissibility under 803(4)'s exception for statements made for the purpose of medical diagnosis or treatment, but trial counsel failed to assert the lack of a foundation for that exception, so the judge admitted the testimony. The appellate court agreed trial counsel's performance was deficient in failing to object to the lack of a foundation for Mayle's and Shestak's hearsay testimony, but concluded any error in the admission was harmless given A.H.'s

testimony, the aggressive cross of A.H., and the fact that the hearsay testimony was "merely cumulative" of A.H.'s testimony. Thus, the court deemed trial counsel not ineffective.

The Indiana Supreme Court denied transfer.

D. Federal Petition for Writ of Habeas Corpus

Hoglund petitioned under 28 U.S.C. § 2254 for habeas corpus relief. The only claims remaining before us are the claim that the trial court violated due process by admitting expert testimony vouching for A.H. and the claim that trial counsel rendered ineffective assistance by failing to object to expert testimony on the basis of hearsay and lack of foundation for the medical exception. In a thoughtful and thorough opinion, the district judge determined Hoglund procedurally defaulted the due process / vouching claim because he relied only on state cases and evidentiary rules when presenting this to the state courts, so he failed to alert them to the federal nature of his claim. But the judge decided to consider the merits of whether the admission of vouching violated due process because this claim is closely related to one properly exhausted. The judge determined Hoglund properly exhausted his state remedies for his claims that trial counsel failed to object to expert testimony on the basis of hearsay and lack of foundation, that trial counsel failed to object to expert testimony that vouched for A.H., and that trial counsel failed to request a mistrial after overt and direct vouching.

The judge turned to the merits of Hoglund's claim that trial counsel was ineffective by failing to properly object to hearsay admitted under the medical exception without the proper foundation. The judge correctly recited the *Strickland* standard: prejudice caused by deficient performance.

Prejudice is a reasonable probability that but for the deficiencies the result would have differed. A reasonable probability is a probability sufficient to undermine confidence in the result. On habeas, there is double deference because the inquiry is whether the state court unreasonably applied *Strickland*.

Trial counsel objected to Butler and Shestak relaying what A.H. told them, but failed to argue the exception did not apply. He did not object at all to Mayle's hearsay testimony, perhaps because he already lost on this issue. At the post-conviction relief stage, the Indiana Court of Appeals held trial counsel performed deficiently by failing to object to hearsay and lack of foundation, but the objectionable testimony did not prejudice Hoglund. The district judge agreed counsel performed deficiently. But the judge found the issue of whether this deficiency prejudiced Hoglund to be a close question.

The judge granted that the improperly challenged hearsay testimony "unquestionably bolstered the credibility of the victim making her testimony much more believable" and "a strong argument could be made that the outcome of the trial may very well have been different without this added boost to the victim's credibility." But the judge recognized that A.H.'s testimony was compelling, graphic, consistent, and detailed, and that a jury could have convicted based on this testimony alone. Also, Hoglund's own statements to the police, although not a confession, were highly incriminating. Finally, Mallot testified about a bathing episode involving Hoglund and then 5-year-old A.H. So the judge concluded the case against Hoglund "was strong—not overwhelming, but strong—even without the testimony of the three experts." The judge could not find that the state court's determination that the error did not prejudice Hoglund was unreasonable.

The judge went on to say that even if trial counsel had properly objected for lack of foundation for the medical exception, the prosecutor might have been able to lay a foundation for at least Butler's hearsay testimony because it appears Butler was actually treating A.H. (Of course, the prosecution would have had to establish not merely that Butler was actually treating A.H., but that A.H. understood the purpose of her visit to Butler at the time.)

The judge turned to the issue of vouching. Hoglund claimed it was objectively unreasonable for the state court to determine that trial counsel's failure to continuously object to vouching and failure to request a mistrial after direct and overt vouching did not constitute deficient performance. Hoglund also claimed the admission of vouching violated his due process right to a fundamentally fair trial. The judge noted the trial was "replete with vouching" and quoted many passages at length from the testimony of all three experts. The judge then observed a dichotomy in the state proceedings. On direct appeal, the Supreme Court overruled *Lawrence* and held that vouching testimony in sexual abuse cases was no longer admissible, but affirmed the trial court's judgment because the admission of the vouching was harmless error given A.H.'s compelling testimony and given that the erroneously admitted vouching was cumulative of other vouching admitted without objection. So at the post-conviction relief stage, Hoglund argued trial counsel was ineffective for failing to object continuously to vouching by Mayle and Shestak and for failing to seek a mistrial after Butler testified A.H. was telling the truth. But the Court of Appeals reasoned trial counsel's performance was not deficient because the Supreme Court had not yet changed the evidentiary rule by the time of trial and because the striking and admonition solved the problem

short of a mistrial. So, "on direct appeal, Hoglund was told that the trial court error was harmless due to trial counsel's mistakes; but, on post-conviction appeal, Hoglund was told that trial counsel's performance was not deficient; and neither decision discussed whether the vouching testimony in its entirety was prejudicial."

Though the district judge questioned the state court's harmless-error analysis, he recognized that the issue before him was whether the vouching testimony produced a significant likelihood an innocent person has been convicted. He could not reach that conclusion, given A.H.'s "extremely compelling" testimony and given Hoglund's strange and incriminating statements to the police.

The judge granted a certificate of appealability on three issues: 1) whether trial counsel's failure to object properly to the hearsay from the three experts relaying what A.H. had told them constitutes ineffective assistance of counsel; 2) whether the admission of vouching testimony was a due process violation; and 3) whether Hoglund procedurally defaulted the due process claim on the vouching testimony.

## IV. Standards

We review the district judge's denial of habeas corpus relief *de novo*. The Antiterrorism and Effective Death Penalty Act limits a federal court's ability to grant a state prisoner's petition for a writ of habeas corpus:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is "difficult to meet" and "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). A state court's decision can be a reasonable application of Supreme Court precedent even if we think it is an incorrect application, and even if petitioner presents a strong case for relief. *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 443 (7th Cir. 2020). This "deferential standard of review applies only to claims that were actually 'adjudicated on the merits in State court proceedings.'" *Campbell v. Reardon*, 780 F.3d 752, 762 (7th Cir. 2015) (quoting § 2254(d)). For each claim, "we review the decision of the last state court to address its merits." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018).

AEDPA generally requires a state prisoner to exhaust the remedies available in state court. 28 U.S.C. § 2254(b)(1)(A). Before bringing a claim on federal habeas, a state prisoner must

present the claim to the state courts so they have a "fair opportunity" to consider and correct the alleged problem. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Benik*, 471 F.3d 811, 814–15 (7th Cir. 2006). The basic question is whether "in concrete, practical terms … the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Kurzawa v. Jordan*, 146 F.3d 435, 442 (7th Cir 1998). We give a "generous interpretation" to *pro se* filings in this context. *Lewis v. Sternes*, 390 F.3d 1019, 1027 (7th Cir. 2004).

Hoglund brings two claims to us: (1) his trial counsel rendered ineffective assistance by failing to object properly to hearsay testimony from the experts relaying what A.H. told them before trial; and (2) the admission of the experts' vouching testimony violated due process.

## V. Ineffective Assistance of Counsel on Hearsay

Hoglund claims trial counsel rendered ineffective assistance by failing to argue no foundation supported the medical exception for the experts to relay what A.H. told them.[5]

---

[5] A bit of housekeeping about Butler. In his brief before us, Hoglund lumps all three experts—Butler, Shestak, and Mayle—into this challenge. And the district judge seemed to consider all three regarding this challenge. He determined the prosecution might have been able to establish a foundation for at least one of them: Butler. The district judge certified the appealability of this issue regarding all three. But the state post-conviction Court of Appeals noted Hoglund only claimed his trial counsel failed to object properly to the hearsay testimony of two experts: Shestak and Mayle. For the proposition in his opening appellate brief that on state post-

A. Standard

To succeed on a claim of ineffective assistance of counsel, petitioner must show (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) the errors deprived the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the second prong, petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* "In deciding whether there is a reasonable probability that the errors changed the outcome of the trial, the court must consider all of the evidence." *Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020).

When asserting an ineffective assistance of counsel claim in an AEDPA petition for a writ of habeas corpus, petitioner faces the obstacle of double deference. He must show the state court's decision is contrary to or involved an unreasonable

conviction review he argued trial counsel failed to appropriately object to hearsay testimony by the experts, Hoglund only cites the state post-conviction Court of Appeals' decision. In its federal appellate response, the government notes that in the state courts, Hoglund only claimed trial counsel was deficient for not making better objections to Mayle and Shestak, and Hoglund does not contest this in his reply. So there might be an exhaustion problem regarding Butler. But resolution is unnecessary. Whether or not the challenge to Butler's hearsay testimony is properly before us, it is likely the prosecution established (or could have established) a foundation for the medical exception for this testimony. And more to the point, either way, the strong, graphic, consistent testimony of A.H. (even under aggressive and at times tedious cross) coupled with Hoglund's strange and incriminating statements assure us trial counsel's deficient 803(4) performance did not prejudice Hoglund.

application of the *Strickland* standard. The last Indiana court to address the merits of Hoglund's ineffective assistance of counsel / hearsay claim was the post-conviction Court of Appeals in 2016. So we review that opinion. The Court of Appeals concluded trial counsel performed deficiently by failing to object to the lack of a foundation for the admission of hearsay by Mayle and Shestak under the medical exception. But the court determined any error here was harmless given A.H.'s testimony, the aggressive cross of A.H., and the fact that the hearsay testimony was "merely cumulative" of A.H.'s testimony. So there was no prejudice. *Hoglund*, 2016 WL 453549, at *6.

B. Deficient Performance?

The state post-conviction Court of Appeals, the district judge, and both parties on appeal to us seem to agree trial counsel was deficient by failing to object to the lack of foundation for the medical hearsay exception. At trial, Rule 803(4) provided a hearsay exception for statements made for medical diagnosis or treatment, provided a foundation was laid: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Rule 803(4) (effective 1994).

The point of this exception is that a court can derive some assurance of the hearsay statement's credibility from the fact that it was made for medical diagnosis or treatment because an out-of-court declarant generally has a strong self-interest in making truthful statements to a medical provider when seeking diagnosis or treatment lest the medical provider

misdiagnose and treat for allergies instead of the plague. But for this exception to serve its purpose, there must be some basis to think the speaker *understood* the medical purpose of the statement. *See McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996). Thus, Indiana courts have recognized that alleged child victims might be too young for a fair presumption they understood the medical purpose, and have required a foundation that they had this understanding. *See id.* ("Where that inference is not obvious, as in this case involving a young child brought to treatment by someone else, there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information.").

The testimony of Mayle (the third expert to testify) is the clearest example of the problem. A.H. gave no testimony about why she thought she was visiting Mayle. Mayle testified she saw A.H. because the prosecutor's office asked for an assessment of her emotional stability and ability to testify. Mayle offered no testimony about A.H.'s understanding of the reason for the visits. No evidence showed A.H. thought she sought medical diagnosis or treatment from Mayle. But when the prosecutor asked Mayle to testify about what A.H. said, defense counsel did not object to hearsay at all, perhaps because he already lost his hearsay objections to the prior experts. Failing to object properly to hearsay was deficient. It allowed Mayle to testify at length about what A.H. said, echoing A.H.'s testimony, thereby lending credibility to A.H. (And it went beyond A.H.'s testimony.)

The testimony of Shestak (the second expert to testify) was also problematic. A.H. gave no testimony about why she thought she was visiting Shestak. Shestak testified A.H. was referred to her for help managing anxiety she experienced as

trial approached, which might have hinted at the possibility for the medical exception to hearsay. But Shestak's testimony about A.H.'s understanding of the purpose of the visits did not establish the requisite foundation: "I asked [A.H.] what exactly was the reason that she was here. She knew the trial was coming up, I asked her what the trial was about and at that point words just began to pour out of her really fast describing incidents … ." The prosecutor asked Shestak to relay what A.H. told her. Defense counsel objected but folded, failed to challenge foundation, and simply said "I understand the exception." The court overruled the objection. Shestak relayed the graphic, lurid details A.H. gave. Defense counsel performed deficiently by failing to challenge the foundation for the hearsay exception during Shestak's testimony.

Butler was the first expert to testify. A.H. did not testify about why she thought she was visiting Butler. Butler testified she saw A.H. at the request of D.C.S. for a sexual abuse exam, and the purpose of this exam included medical diagnosis and treatment. The prosecutor asked Butler to relay what A.H. said about the purpose. Defense counsel objected to hearsay. The prosecutor invoked the 803(4) exception. Defense counsel failed to argue foundation. (The question, after all, went to foundation.) The court overruled the objection. Butler testified A.H. said she was in for a checkup. This might be, or at least approaches, a satisfactory foundation for the medical exception. "Checkup" is commonly used by children and adults to mean a medical visit for diagnosis or treatment. It is possible, perhaps even likely, arguments attacking foundation here would have failed. We do not know with certainty because the issue was not developed. Defense counsel did not challenge foundation, so the prosecution had no occasion to elaborate. There was no voir dire or other further inquiry on this

point. Butler proceeded to relay A.H.'s graphic account of the sexual abuse, echoing the testimony A.H. just gave the jury.

Defense counsel's performance regarding the hearsay testimony of at least Mayle and Shestak was deficient.

C. Prejudice?

The next question for the post-conviction Court of Appeals was whether this deficient performance prejudiced Hoglund. The court held it did not because A.H. testified and "was aggressively cross-examined." Her testimony mirrored the hearsay given by Mayle and Shestak, "making the expert witnesses' testimony merely cumulative and, at most, harmless error." Hoglund argues the post-conviction Court of Appeals' decision on this point was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

1. contrary to clearly established federal law?

Hoglund argues the state court's decision was contrary to federal law because the court applied the wrong standard. Shortly before presenting its conclusion, the court quoted *VanPatten v. State*, 986 N.E.2d 255, 267 (Ind. 2013), for the proposition that "[a]dmission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted." Hoglund argues this is the wrong standard. He argues the appropriate question was not whether admission of hearsay was sufficiently prejudicial to warrant reversal of the conviction but merely whether there was a reasonable probability that, absent the errors, the jury would have had a reasonable doubt about guilt. He argues Indiana courts use varying terminology to define reversible error. He points to *Jaske v. State*, 539 N.E.2d 14, 22 (Ind. 1989), where the

reversible-error inquiry was whether there is a "substantial likelihood" that the challenged evidence contributed to the conviction. He points to *Miller v. State*, 436 N.E.2d 1113, 1114 (Ind. 1982), for the proposition that the reversible-error inquiry was whether the error had "substantial influence." Hoglund argues the correct standard here requires only a reasonable probability of a different outcome, not the substantial likelihood of a different outcome required by the state court, so the state court's analysis was contrary to *Strickland*.

A state court's decision is contrary to clearly established federal law for these purposes if the state court's decision is "diametrically different, opposite in character or nature, or mutually opposed" to Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted). There are several potential reasons to think the state court here did not apply a standard contrary to *Strickland*.

First, the state court correctly discussed the *Strickland* standard earlier in its opinion. The court observed *Strickland* requires prejudice caused by deficient performance. The court wrote: "To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hoglund complains this was eight pages before the conclusion, but that is only because the court discussed three other potential areas of ineffective assistance of counsel before reaching hearsay.

Second, the actual analysis the state court gave—that A.H. testified and was aggressively cross examined, and the hearsay testimony was merely cumulative of A.H.'s testimony— is not contrary to (or an unreasonable application of) *Strickland*. The court said the problematic hearsay testimony was

merely cumulative of A.H.'s aggressively cross-examined tes-
timony, and was at worst harmless. That is, trial counsel's de-
ficient performance did not prejudice Hoglund because there
is no reasonable probability of a different outcome without
the deficiency.

Third, we are not convinced the state court's quotation of
*VanPatten*'s language about "reversal" suggests the gap
Hoglund claims. After all, the state court also quoted lan-
guage from *VanPatten* that "errors in the admission of evi-
dence are to be disregarded as harmless error unless they af-
fect the substantial rights of a party." If an error is harmless
and does not affect the substantial rights of a party, then it
does not cause the party *Strickland* prejudice. If an error truly
results in merely cumulative, harmless repetition, then it does
not prejudice the party. And the court did not cite or use "sub-
stantial likelihood" language. Hoglund imported that.

Ultimately, it is unclear whether the state court applied the
wrong standard or whether "it is more likely that the court
stated its conclusion imprecisely than that it applied a differ-
ent standard," as we held in *Malone v. Wells*, 538 F.3d 744, 758
(7th Cir. 2008). But we need not decide that question because
even under a *de novo* application of *Strickland*, without
AEDPA deference, we conclude trial counsel's deficient per-
formance did not prejudice Hoglund.

2. unreasonable application of clearly established federal law?

Because he claims the state court applied the wrong stand-
ard, Hoglund asks us to independently determine whether
there was a reasonable probability the outcome would have
differed. There was not. We independently conclude there
was no reasonable probability that, but for counsel's deficient

performance on hearsay, the result of the trial would have differed.

A.H.'s testimony was strong, graphic, detailed, and internally consistent. When A.H. did not remember something, she said so. A.H. testified about a course of sexual abuse over an extended period of time. As noted, her testimony included all five senses. One might say her testimony even included a sixth-sense premonition her father might consider abusing her younger sister. Hoglund's trial counsel subjected her to extensive, probing, aggressive, detailed, even at times tedious cross examination, but she held up. Her account remained consistent. A jury may convict on the basis of the alleged child victim's testimony alone. *Deaton v. State*, 999 N.E.2d 452, 456 (Ind. Ct. App. 2013) (collecting cases). We agree with the district judge's assessment that "the victim's testimony was compelling with respect to the graphic nature of the conduct described and its consistency and detail. A reasonable jury could have convicted on the basis of this testimony alone."

Hoglund flatly denied abusing his daughter, but he also made multiple strange and incriminating statements. Malott testified about opportunity. A.H. and Hoglund were extremely close and spent time alone together, including in a locked bedroom. Malott testified about A.H. reporting abuse twice, and about fleeing the house with her children. Holliday testified Hoglund denied the accusations: "No way." But Hoglund also made strange statements. He talked about A.H. watching an oral sex movie he left in the VCR. He talked about A.H. seeing him and his wife having oral sex. He talked about A.H. seeing him masturbating and ejaculating, and Holliday quoted Hoglund as saying during the interrogation: "'The f*cking sh*t went everywhere.'" After prodding by

Holliday, Hoglund "made comment that not unless [he] was passed out sleeping and [she] took it upon herself." Hoglund claimed there was never a time when he was coherent that it happened. He said he was trying to think if it could have happened when he was "f\*cked up." Holliday testified A.H.'s testimony was consistent with what she told him years earlier.

Even without the objectionable hearsay, the case against Hoglund was strong. The evidence was not in equipoise, as Hoglund claims. Trial counsel's deficient performance did not prejudice Hoglund. There is no reasonable probability that, but for counsel's deficient performance on hearsay, the result of the trial would have been different.[6]

## VI. Due Process and Vouching

Hoglund also claims entitlement to habeas relief because the admission of improper vouching testimony violated his right to due process.

A. Procedural Default?

First, we must address whether Hoglund procedurally defaulted this claim. Appellee argues Hoglund failed to raise a federal due process claim to the Indiana courts, so this claim is barred. According to Appellee, Hoglund based his direct-appeal arguments regarding vouching on state evidentiary rules, not on the United States Constitution or federal cases,

---

[6] Moreover, Hoglund has shown no reason all three experts could not have testified they saw A.H. for sexual abuse allegations. Even with no hearsay, the jury could have heard A.H. saw professionals several times over multiple years about the abuse. Furthermore, very likely there was (or easily could have been) a foundation for the medical exception to Butler's hearsay. But we do not rely on any of this.

and he never argued on direct appeal that the admission of vouching rose to the level of a federal constitutional violation. Given that fair presentment does not require hypertechnical congruency, that we interpret generously for *pro se* petitioners, and that the Indiana Supreme Court seemed to understand the potential due process implications of the claim, we conclude it was not procedurally defaulted.

B. Merits[7]

Hoglund invokes *Howard v. O'Sullivan*: "To be of constitutional import, an erroneous evidentiary ruling must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial." 185 F.3d 721, 723–24 (7th Cir. 1999). This is when the error "produced a significant likelihood that an innocent person has been convicted." *Id.* at 724.

No doubt the experts indirectly and directly vouched. On direct appeal, the Supreme Court overruled *Lawrence* but affirmed because the admissions were harmless given the substantial independent evidence of guilt from A.H.'s lengthy

---

[7] Two Indiana appellate courts issued reasoned decisions against Hoglund on vouching. In 2012, the direct-appeal Supreme Court addressed vouching in terms of the state evidentiary rule and due process, and not in terms of ineffective assistance. In 2016, the post-conviction Court of Appeals addressed vouching in terms of ineffective assistance, and not in terms of due process. The district judge held *the state courts'*—plural—determination that the error did not prejudice Hoglund was not unreasonable. But the district judge certified the appealability of the vouching issue only in due process terms. On vouching, Hoglund only asks us to review the 2012 Supreme Court decision. The government by its citations seems to think on page 16 of its response that we review the 2012 Supreme Court decision, but on page 17 that we review the 2016 Court of Appeals decision. We review the 2012 Supreme Court decision. But either way the outcome would be the same.

testimony, consistent and unshaken under aggressive cross examination. (The post-conviction Court of Appeals later concluded trial counsel's failure to make consistent and thorough objections to indirect vouching was not ineffective assistance because at the time of trial *Lawrence* was still good law.)

Appellee argues Hoglund does not offer any clearly established Supreme Court precedent on expert vouching that his conviction violates. His attempt to use analogous cases on prosecutorial vouching reflects the fact that there is no clearly established Supreme Court precedent on expert vouching in this context. But even accepting the standard advanced by Hoglund from *Howard*, we conclude he is not entitled to habeas relief. The errors at trial regarding vouching were not so prejudicial that they compromised Hoglund's due process right to a fundamentally fair trial. The errors did not cause a significant likelihood an innocent person was convicted.

Hoglund's fundamental premise is that without the experts' vouching (and hearsay), the case was merely "he-said, she-said," the case was "not a strong one," the weight of the evidence against Hoglund "was not great," "the evidence is at best in equipoise." Hoglund points us to *Jordan v. Hepp*, where we wrote that when a prosecutor improperly vouches "and the case is not otherwise a strong one, prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." 831 F.3d 837, 848 (7th Cir. 2016) (internal quotation marks omitted). Hoglund notes that the district judge below recognized the evidence against Hoglund (without the problems) was "not overwhelming."

We disagree with Hoglund. The case against him without the problems (even broadly construing the problems) was strong. The evidence was not in equipoise. True, the district

judge thought the case was not overwhelming. But he said multiple times he thought it was strong even without the experts. We agree. A.H.'s testimony was strong, compelling, graphic, often detailed, and consistent. Extensive, aggressive, even tedious cross did not shake or expose A.H. Hoglund's own statements were sometimes suspicious and incriminating. The vouching did not produce a significant likelihood an innocent person was convicted. The state court did not reach a decision on this issue that was contrary to, or involved an unreasonable application of, clearly established federal law.

## VII. Conclusion

We affirm the denial of habeas relief.